**SO ORDERED.**

**SIGNED this 27th day of May, 2008.**

_____

**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court

### Western District of Texas
### San Antonio Division

| | |
|---|---|
| IN RE<br><br>ANDREW MOUNCE &<br>VALERIE MOUNCE,<br><br>_DEBTORS_ | BANKR. CASE NO.<br><br>03-55022-LMC<br><br>CHAPTER 7 |
| VALERIE MOUNCE,<br>ON BEHALF OF HERSELF AND ALL OTHERS<br>SIMILARLY SITUATED,<br><br>_PLAINTIFFS_<br><br>V.<br><br>WELLS FARGO HOME MORTGAGE, INC.,<br><br>_DEFENDANT_ | ADV. NO. 04-05182-LMC |

### MEMORANDUM OPINION ON THE PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Pending before the court is a motion for class certification (the "Motion") under Federal Rule

of Civil Procedure 23(b)(2)&(3), filed by plaintiff Valerie Mounce, on behalf of herself and others

similarly situated.[1]  A hearing was held on the Motion on August 21, 2007, and the parties have been

---

[1] Motion for Class Certification, Dkt. #107.  Federal Rule 23 is made applicable to this adversary proceeding by Bankruptcy Rule 7023.  _See_ Fed. R. Bankr. P. 7023 (2003).

given ample time to provide briefing on the issues presented in this case. For the reasons that follow, the motion will be granted in part and denied in part.

## I. BACKGROUND

The plaintiff is also a co-debtor in the related chapter 7 bankruptcy case, originally filed with her husband in 2003. She commenced this adversary proceeding on December 22, 2004, by filing a complaint against Wells Fargo Home Mortgage, Inc. ("Wells Fargo"). In her complaint, she asserts counts of Wells Fargo's alleged misrepresentations, breaches of contract, and coercion.[2] Before the commencement of this underlying bankruptcy case, Wells Fargo was the servicing agent for the plaintiff's home loan. At that time, she and her husband were current on their loan payments to Wells Fargo. Later, during the case, however, she and her husband fell behind on their mortgage payments, and Wells Fargo moved for relief from stay. That motion resulted in an agreed order between Wells Fargo and the plaintiff in which the plaintiff agreed to cure the post-petition arrearage and also agreed to pay "post-petition attorney's fees and costs incurred by [Wells Fargo] in bringing this [Lift Stay] Motion in the amount of $600.00."[3] Ms. Mounce contends that she paid these fees and costs as directed by the terms of that agreed order. The subject of her complaint is that she says Wells Fargo misrepresented the amount of fees and costs that it *actually* incurred to the law firm of Brice, Vander, Linden & Wernick, P.C. ("Brice") for bringing the lift stay action, so that the "agreed order" directed her to pay more in fees than Wells Fargo had actually incurred. She adds that Wells

---

[2] *See* Plaintiff's Second Amended Class Action Complaint ("Complaint"), Dkt. #103. The Complaint asserts a few causes of action in addition to these three counts. In light of the representations made by counsel that the plaintiff wishes to pursue certification only with regard to these three claims, however, the court will only address the plaintiff's claims for misrepresentation, breach of contract, and coercion. *See* Transcript of Hearing on Aug. 21, 2007 at 46:15-19 (Dkt. #125).

[3] *Id.*, Ex. B.

Fargo declined to reimburse the fees she paid that exceeded the amount Wells Fargo actually incurred.

As the named plaintiff in this putative class action, Ms. Mounce contends that her dealings with Wells Fargo were not unique to her.  In fact, she says, what happened in her case reflected Wells Fargo's standard practice, particularly for cases in which Brice represented Wells Fargo.[4]  She has thus moved for certification of the *Relief From Stay Overcharge Class*, which is defined as follows:

> All individuals:
> (1) who had or have a home mortgage loan serviced by Wells Fargo;
> (2) who filed for bankruptcy under chapter 7 or 13 in any judicial district in the state of Texas;
> (3) whose loan Wells Fargo referred to Brice, Vander, Linden & Wernick, P.C. for bankruptcy services;
> (4) against whom Wells Fargo filed a motion for relief from stay; and
> (5) from whom Wells Fargo demanded and/or collected fees and costs in connection with the motion for relief from stay
>
> during a time period between the date five years prior to the filing of the First Amended Class Action Complaint[5] and the present.

*See* Motion, Dkt. #107.

Wells Fargo objects to the Motion, arguing first that there is no cognizable cause of action for coercion under federal or Texas law.  Second, argues Wells Fargo, the proposed class cannot be certified under Federal Rule 23(b)(3) because an essential element of the plaintiff's fraud claim is detrimental reliance on Wells Fargo's alleged misrepresentations.  Because reliance is a highly individualized issue, argues Wells Fargo, certification of this class would be inappropriate — a trial

---

[4] The standardized nature of Wells Fargo's practice is crucial to the plaintiff's class complaint for reasons discussed later in this opinion.

[5] The First Amended Class Action Complaint was filed on November 6, 2006.  *See* Dkt. #73.

on the merits of the class' claims would only degenerate into multiple separate trials.  Wells Fargo's third argument is that the agreements between Wells Fargo and each putative class member are distinct, so there cannot be a common issue determinable on a class-wide basis.  Finally, Wells Fargo contends, its defenses require the introduction of evidence pertaining to independent negotiations between Brice attorneys and individual class members.  Because these negotiations are highly individualized issues, says Wells Fargo, its defenses will cause this class action to degenerate into multiple separate trials.  This case thus cannot be certified under the federal rules and the applicable case law of this circuit, so the argument goes.

The plaintiff responds that there is only one real issue in this case, and that is whether Wells Fargo has over-charged putative class members for fees which were not actually incurred in the course of bringing Wells Fargo's motion for relief from stay in each respective bankruptcy case.  All other matters are common issues of law or fact, she argues, or may be determined on a class-wide basis.  The relevant terms of each class member's loan documents are the same or substantially the same, and the terms of the orders lifting stay, or the agreed orders modifying stay, in each putative class member's bankruptcy case all required payment of the same $600.00 fee as a standard fee, purportedly charged by Brice to Wells Fargo, and then allegedly passed on to the debtors via standard terms in the orders modifying or terminating the stay.  According to Ms. Mounce**,** Wells Fargo *actually* incurred fees *less* than the number represented in each respective order.  Ms. Mounce further contends that proof of class members' individual reliance on Wells Fargo's representations will not be necessary, because it may be established constructively, based on Brice's standardized lift stay practices and the bankruptcy courts' endorsements of those standardized forms of order submitted by Brice on behalf of Wells Fargo.  As for damages, inequality in amounts alone does not

mean that individual issues will predominate, argues the plaintiff, particularly when the calculation

of damages will require the application of a simple formula.  In this case, Ms. Mounce contends that

the fees actually incurred by Wells Fargo can be obtained through discovery of Brice's invoices and

then easily determined class-wide without introducing evidence from each putative class member.

For the reasons set out in greater detail in this opinion, the court finds that class certification

*is* appropriate under Rule 23(b)(3).

## II. JURISDICTION

The court finds that the matters asserted in this adversary proceeding could arise only in the

context of a case under title 11, and so this court has subject matter jurisdiction over this proceeding.

28 U.S.C. § 1334(b).  For that reason, and because the claims asserted against Wells Fargo affect

creditor-debtor relationships, this adversary proceeding is a core proceeding such that this court may

hear and make final determinations on the merits of the claims asserted.  *See Geruschat v. Ernst &*

*Young, LLP (In re Seven Fields Dev. Corp.),* 505 F.3d 237, 263 (3d Cir. 2007) ("Because we have

concluded that the bankruptcy and district courts correctly found 'arising in' core jurisdiction so that

the 'close nexus' test did not apply, we need not resolve the issue appellants raise relating to the

applicability of the 'close nexus' test in the 'related to' post-confirmation context."); 28 U.S.C.

§§ 157(b)(1)&(2)(O).  This matter is an adversary proceeding under Bankruptcy Rule 7001(1),[6] and

so the court applies Part VII of the Federal Rules of Bankruptcy Procedure to the present matter.

Venue is also proper under section 1409(a) of title 28.

---

[6] "[A] proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of the Code, Rule 2017, or Rule 6002." Fed. R. Bankr. P. 7001(1).

### III. DISCUSSION

#### A. *Coercion Claim*

The plaintiff asks for class certification on three causes of action: breach of contract, misrepresentation, and coercion. As a threshold matter, the court could find no authority, nor could the plaintiff cite any, for the recognition of the coercion theory as an independent cause of action under either Texas or federal law. The plaintiff offers, at best, the argument that coercion "is associated with a breach of contract cause of action."[7] The plaintiff in effect argues that by the simple *fiat* of Wells Fargo's superior bargaining power, the putative class members have a separate and distinct cause of action against Wells Fargo. While unequal bargaining power may lend itself to certain contractual defenses, this court declines to create such a new, independent cause of action not previously recognized by the Fifth Circuit or the Supreme Court of Texas. As it would be improper to certify a class action under a legal theory which is not cognizable under applicable state and federal law, this court cannot grant the plaintiff's motion as to this particular claim. The plaintiffs' remaining causes of action — breach of contract and negligent misrepresentation (or fraud) — are cognizable under Texas jurisprudence. The court will discuss class certification under these two remaining theories. While Texas substantive law will apply to the plaintiff's remaining claims,[8] class certification is a matter of federal procedure and thus is governed by Rule 23 of the Federal Rules of Civil Procedure. *See Erie R. Co. v. Thompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Hanna v. Plumer,* 380 U.S. 460, 463-64, 85 S.Ct. 1136, 1140, 14 L.Ed.2d 8 (1965); *see generally* 19 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE &

---

[7] Transcript at 48:8-19.

[8] This point is relevant for reasons discussed later in this opinion.

-6-

PROCEDURE 2D *Jurisdiction* §§ 4501-08 (2008). We turn next to that rule.

## B. *The Standards of Rule 23*

To certify a class in a federal court, the plaintiff must demonstrate that the proposed class meets certain criteria. First, the plaintiff must demonstrate the proposed class meets the four prerequisites of Rule 23(a).[9] Those prerequisites are: (1) "numerosity" — the class is so numerous that joinder of all members is impracticable; (2) "commonality" — there are questions of law or fact common to the class; (3) "typicality" — the claims or defenses of the representative parties are typical of the other putative class members; and (4) "adequacy of representation" — the representative parties will fairly and adequately protect the interests of the putative class members. Fed. R. Civ. P. 23(a). If the class meets all four of these prerequisites, the class may be certified if it also qualifies as one of the three types of class actions maintainable under Rule 23(b). The plaintiffs in this case seek certification under subsections (b)(2) and (b)(3). We begin with the prerequisites.

### 1. *Numerosity (a)(1)*

In finding a class to be sufficiently numerous under Rule 23(a)(1), a court must consider the size of the class, the ease of identifying its members and of determining their addresses, the best method of contacting them if joined, and their geographic dispersion. *See Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980) (citing 7 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE *Civil* § 1762 (1972)). "The basic question is practicability of joinder, not number of interested persons *per se*." *Id.*; *see, e.g., In re Talbert*, 347 B.R. 804, 808-09 (Bankr. E.D. La. 2005) (finding

---

[9] The actual rule applicable to the plaintiff's motion is Bankruptcy Rule 7023. That rule merely incorporates and makes applicable Federal Rule of Civil Procedure 23 in adversary proceedings such as this one. Fed. R. Bankr. P. 7023. For that reason, the remainder of this opinion focuses on Rule 23 of the Federal Rules of Civil Procedure itself.

88 members to be sufficiently numerous).  The plaintiffs in this case estimate the proposed class to

contain somewhere between 91 and 400 members spread throughout the four judicial districts in

Texas.  Joinder of this many class members over such a vast geographical area would be difficult,

if not impossible, without the tools available to a class action.  By means of a class action, the class

may make use (through discovery) of Wells Fargo's records to locate and contact the putative class

members.  Without a class action, at best, the plaintiffs could use electronic filing systems from the

bankruptcy courts, but those filing systems are not so easily searched and may not contain the current

addresses and contact information for potential class members. Wells Fargo, as the loan servicing

agent, would be more likely to have up-to-date records.  The state of Texas contains four federal

judicial districts, each of which maintains its own filings independently of the other three districts.

The court is satisfied that joinder would be impracticable without the means of a class action.  The

numerosity requirement of Rule 23(a)(1) is thus satisfied in this case.

2.  _Commonality (a)(2)_

"The test for commonality is not demanding and is met 'where there is at least one issue, the

resolution of which will affect all or a significant number of the putative class members.'"  *Mullen

v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir.1999) (quoting *Lightbourn v. County of

El Paso,* 118 F.3d 421, 426 (5th Cir.1997)).  "A question is not common, by contrast, if its resolution

'turns on a consideration of the individual circumstances of each class member.'" *Thorn v.

Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (quoting 7A C. WRIGHT, A. MILLER

& M. KANE, FEDERAL PRACTICE AND PROCEDURE § 1763 (3d ed.2005)).  To further analyze this

element, we must look to the two remaining claims:  breach of contract and misrepresentation.

For the breach of contract claims, we need to know whether the putative class members were

-8-

parties to essentially the same contract with respect to the allocation of Wells Fargo's legal fees to their accounts. The construction of the loan agreements makes for one legal issue that would "affect all or a significant number of the putative class members." *See Mullen,* 186 F.3d at 625. The evidence in the record supports a finding that the contracts of the putative class members are substantively identical — the operative language in each class member's loan documents purports to allow the charge of "necessary and proper" legal fees incurred by the lender in enforcing its rights in the property. Likewise, the fee charged by Wells Fargo in each case was $600.00. Those charges were then authorized by essentially identical (standardized) language in the orders on Well Fargo's motions for relief from stay. The only real questions that the court will need to resolve at trial on the breach of contract cause of action are whether the operative language in the putative class members' contracts in fact authorized the fees that were charged, and whether those charges were actually necessary and proper in light of the agreements between Wells Fargo and the putative class members. As a result, there are clear, common issues which will affect the outcome for most, if not all, of the putative class members' claims. The court thus concludes that the commonality prerequisite is met.[10]

Turning to the misrepresentation or fraud claim, the common issue here is whether Wells Fargo misrepresented its actual attorneys' fees in the orders resolving the motions for relief from stay. The representations were made by Wells Fargo *to a bankruptcy court* and to the putative class members (the debtors) as part of a *standardized* practice. The fees were incurred by the same law firm and billed to Wells Fargo, and the agreed orders between Wells Fargo and the putative class

---

[10] Whether there are individual issues with respect to the breach of contract claim that may predominate over these common issues is an issue with maintainability under Rule 23(b)(3) and will be discussed *infra*.

members contained essentially identical terms regarding attorneys' fees incurred in bringing the motions..[11] These facts raise several common issues which affect the class as a whole. Wells Fargo argues that a finding of fraud will turn on the reliance of each putative class member. That argument, however, does not address whether commonality exists for the purposes of Rule 23(a)(2). Instead, Wells Fargo's argument goes to whether common issues *predominate* over the individual ones, an argument against the maintainability of a class action under Rule 23(b)(3). The court addresses the requirements of Rule 23(b)(3) in detail later in this opinion.[12] For the purposes of commonality, however, it is clear that at least one common question of law or fact exists which will affect the outcome of the plaintiff's claims under both remaining theories. This prerequisite is met.

*3. Typicality (a)(3)*

The question for the purposes of the typicality prerequisite of Rule 23(a)(3) is whether the plaintiff's claims are typical of the claims of the putative class members. The focus of this analysis should be on "whether the named representatives' claims have the same essential characteristics as the claims of the class at large," even if there are *some* factual distinctions between the claims of the named plaintiffs and the putative class members. *See Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596-97 (7th Cir. 1993) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

---

[11] Over the years, mot of the players in the consumer bankruptcy practices — secured creditors and their lawyers on the one hand, and consumer debtors and their lawyers on the other hand — have developed standardized terms for use in the resolution of stay relief motions. The language that has developed over several years of practice and tens of thousands of cases has become, for all intents and purposes, boilerplate. In motions for relief involving mortgages, virtually all agreed orders include a standard provision requiring, as part of the debtor's cure of her mortgage arrears, that the debtor also pay the lender's legal fees incurred in bringing the motion.

[12] Wells Fargo also contends that determination of damages for each putative class member will require proof from each individual. Again, such an argument goes not to commonality under Rule 23(a)(2), but to whether a class action is maintainable under Rule 23(b)(3) — that is, whether these common questions of law or fact predominate the issues which vary from class member to class member. As this opinion discusses below, the plaintiff's proposed damage model resolves the need for individual evidence of damages.

-10-

Ms Mounce has shown that she was a party to a loan agreement that was in a form typical of the class — that is, a home mortgage loan serviced by Wells Fargo and referred to Brice for legal services upon a debtor's default. Like the putative class members, Ms. Mounce too filed a bankruptcy petition in a Texas bankruptcy court. Wells Fargo filed a motion to lift stay in her proceeding. Ms. Mounce then consented to an agreed order, and that agreed order contained a representation that Wells Fargo incurred $600.00 in legal fees to prosecute the relief from stay motion which Ms. Mounce was then ordered to pay. The plaintiff has also presented evidence that Brice billed Wells Fargo an amount less than $600.00 for prosecuting the motion. Ms. Mounce's claim thus appears to be the *very definition* of the proposed class.

Wells Fargo argues, however, that the plaintiff was a chapter 7 debtor, and so her claims cannot be typical of the claims held by putative class members who were chapter 13 debtors. That argument is simply without merit. The lift stay proceedings and relevant law are virtually identical between these two chapters. Other than the fact that seven does not equal thirteen, Wells Fargo offers no substantive legal reason why Ms. Mounce's being a chapter 7 debtor would result in anything atypical of a chapter 13 debtor in the context of a motion for relief from stay. Wells Fargo also argues that "each putative class member's situation is completely different and unique."[13] Besides being redundant, the statement is conclusory. Wells Fargo fails to explain *how* each situation is different. And, even assuming that situations may differ among the putative class members, such an argument would go to *commonality*, not *typicality*. Based on the facts described above and the class definition, the court concludes that Ms. Mounce's claims have the same essential characteristics of the class at large, and the typicality prerequisite is satisfied.

---

[13] Wells Fargo's Response, at 8.

-11-

### 4.  *Adequacy of Representation  (a)(4)*

Wells Fargo does not contest that the representative parties would adequately represent the putative class members, and the court finds no basis for such a challenge.  The named plaintiff and her attorneys of record are knowledgeable of the facts and the law and will more than adequately represent the unnamed class members.  The court is satisfied that this last prerequisite is met.

### C.  **Maintaining a Class under Rule 23(b)**

Having found all four prerequisites of subsection (a) to be met, the court next turns to the types of class actions which may be maintained under Rule 23(b).  The rule lists three types of actions.  The plaintiff does move for certification under Rule 23(b)(1), which leaves the possibility of maintaining the class under Rule 23(b)(2) or (b)(3).  A class may be maintained under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  A class may be maintained under Rule 23(b)(3) upon a finding by the court "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Id.* 23(b)(3).

### 1.  *Injunctive or Declaratory Relief Under Rule 23(b)(2)*

It is unclear just what declaratory relief the plaintiff requests in her class action complaint.  She suggests that "overcharging for attorney's fees and costs against plaintiffs and class members is improper."  Well, yes.  Overcharging is improper, but the putative class members do not require

an order of this court to change that dilemma.[14]  The plaintiff also seeks "an end to the ongoing practices," and "reformation of class members' accounts and restitution of improper charges."  The court can quickly dispense with the latter remedies — "reformation of accounts" and restitution.  These claims are simply a request for money judgment.  Class actions seeking monetary damages may be maintained under Rule 23(b)(2), but *only* "so long as the predominant relief sought is injunctive or declaratory."  *See Allison v. Citgo Petroleum*, 151 F.3d 402, 411 (5th Cir. 1998) (adopting this intermediary approach along with nearly every other circuit, but noting that *Ticor Title Ins. Co. v. Brown,* 511 U.S. 117, 121, 114 S.Ct. 1359, 1361, 128 L.Ed.2d 33 (1994) casts doubt on the proposition that class actions seeking *any* monetary damages can be certified under Rule 23(b)(2)).

The court is convinced that the final relief sought through the proposed class action is *not* predominantly injunctive or declaratory.  Restitution and reformation of the plaintiffs' and putative class members' accounts are the predominant remedy sought here, and they are predominantly monetary in nature.

The claim for "an end to ongoing practices" may seem, on its face, to request relief that is injunctive or declaratory in nature.[15]  But when one digs a little deeper into that request, it becomes clear that what the plaintiff seeks is an order protecting *future* debtors.  That sort of relief would not benefit the class members as a whole.  Indeed, it would not benefit *any* of the members of the class as it has been defined.  The proposed class includes those who have *already* been damaged by Wells

---

[14] Moreover, the complaint does not appear to state a cause of action by which this court could enjoin Wells Fargo from overcharging its customers.

[15] *See* Transcript at 52:9-10 ("Ms. Kavanagh: Well, the – the damages here happened to Ms. Mounce, as well. And Ms. Mounce wants [Wells Fargo's conduct] to stop going forward so that other similarly situated debtors do not face what she was facing.").

Fargo's alleged conduct. The class does not include, however any *future* Wells Fargo customers who later file for bankruptcy. These potential victims have not yet filed for bankruptcy, have not yet had their cases referred to Brice, have not yet had lift-stay motions brought against them, and have not yet had to comply with orders modifying stay. In other words, the beneficiaries of the plaintiffs' requested injunctive relief — these *potential* victims — would not even be members of the class as it has been defined. Putting an end to this practice would benefit only *non*-class members. All that is left of the plaintiff's requested relief, then, are monetary damages, which makes certification under Rule 23(b)(2) inappropriate under the circumstances. The court thus concludes that the proposed class may not be certified under Rule 23(b)(2).

2. *Predominance and Superiority of Rule 23(b)(3)*

Certification under Rule 23(b)(3) is generally regarded as the default rule for certification. This provision "was intended to dispose of all other cases in which a class action would be 'convenient and desirable,' including those involving large-scale, complex litigation for money damages." *Allison,* 151 F.3d at 412-13 ("Rule 23(b)(3) is the appropriate means of class certification when monetary relief is the predominant form of relief sought and the monetary interests of class members require enhanced procedural safeguards."). To certify a class under Rule 23(b)(3), the court must determine whether: (i) the common issues predominate over the individual issue, and (ii) a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). "The predominance and superiority requirements are 'far more demanding' than is rule 23(a)(2)'s commonality requirement." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003) (citing *Amchem Prods. v. Windsor,* 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

-14-

Rule 23(b)(3) contains a list of factors which the Advisory Committee considered to be pertinent to a court's analysis under that provision. Those factors are as follows:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The first three factors all favor certification of this class. First, there is a very small monetary return for individual class members. Ms. Mounce estimates the damages to be less than one hundred dollars per class member, on average. Second, this litigation has been pending before this court for several years, and there has already been a fair amount of discovery completed. The court is unaware of any other outstanding suits by putative class members under this theory.[16] Third, litigation in this forum would be desirable. The damages requested allegedly arose in bankruptcy cases during the resolution of relief from stay motions based on allegedly false representations made by Wells Fargo to various bankruptcy courts in this state. The wrongful conduct which the plaintiff alleges to have injured putative class members is, for all intents and purposes, the same in each respective case. More importantly, though, the small size of the individual recoveries — an average of less than $100 per class member, if the plaintiff's estimations are correct — makes the concentration of the litigation in a single forum *substantially* more desirable, an important factor in determining whether a class may be maintained under Rule 23(b)(3).

The fourth and final factor requires the court to consider the difficulties that are likely to arise

---

[16] Wells Fargo, or one of its affiliates, has become the subject of many unrelated class actions. *See* Rachel Sams, *Wells Fargo Faces Another Baltimore Housing Lawsuit*, BALTIMORE BUS. J. (Jan. 11, 2008), *available at* http://www.bizjournals.com/baltimore/stories/2008/01/14/story16.html (last visited Apr. 14, 2008). Those cases have no bearing on this court's decision in this matter.

in managing this class action.  In doing so, the court must inquire how the case will be tried, including the substantive law issues which will control the outcome of the litigation.  *See Castano v. Am. Tobacco Co.,* 84 F.3d 734, 741 (5th Cir. 1996) (quoting *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 316 (5th Cir. 1978)).  While an inquiry into the difficulties likely to arise in this potential class action does not require the court to rule on the merits, it *does* require the court to look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law.  *Id.* at 744-45; *see also O'Sullivan,* 319 F.3d at 738.[17]  The difficulties likely to arise in managing a class action premised on fraud or misrepresentation generally concern how the class representative will prove reliance for the class as a whole.  That is because proof of reliance depends on individual factors relevant only to a particular victim, or a small group of victims.  *See, e.g., Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*, 319 F.3d 205, 211 (5th Cir. 2003).  It is upon this "difficulty" that Wells Fargo relies as its primary objection to the plaintiff's Motion.[18]  To evaluate whether this reliance issue can be determined on a class-wide basis, we turn to Texas fraud jurisprudence, which is the substantive law applicable to the proposed class' fraud claims.

### i. *Proof of Reliance Under Texas Law*

Under basic tort theory, a plaintiff who wishes to assert a fraud or misrepresentation claim must demonstrate that a defendant's conduct was the proximate cause of the plaintiff's injury.  Indeed, proximate cause is the glue that binds the conduct to the injury.  In the context of fraud,

---

[17] It is important to note that this court makes absolutely no ruling on the merits of the plaintiff's case.  Instead, the court must determine whether the issues likely to arise during trial on the merits (*e.g.*, reliance) will be *determinable* on a class-wide basis.  The court expresses no opinion, one way or another, regarding whether the plaintiffs may actually be able to prove these issues at trial, or whether Wells Fargo may successfully disprove those issues.

[18] Wells Fargo seems to contend that *no* class action is maintainable under Rule 23(b)(3) where fraud is claimed.  As discussed below, that argument is based upon Wells Fargo's flawed reading of *Sandwich Chef*, and it further ignores the other three factors of Rule 23(b)(3) which all favor certification of the proposed class.

proof of detrimental reliance may be used to establish proximate cause. Prosser explains the function of the reliance element as follows:

> The causal connection between the wrongful conduct and the resulting damage, essential throughout the law of torts, takes in cases of misrepresentation the form of *inducement of the plaintiff to act*, or to refrain from acting, to his detriment. *The false representation must have played a material and substantial part in leading the plaintiff to adopt his particular course*; . . . It is enough that the representation has had a material influence upon the plaintiff's conduct, and been a substantial factor in bringing about his action.

WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS 714-15 (4th ed. West 1971) (emphasis added). It is perhaps because a false representation must play a "material or substantial" role in the victim's adopted course of action that Texas fraud jurisprudence requires proof of reliance to establish proximate cause of the plaintiff's injury. *See Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). Under Texas law, a claim for fraud is established by proving that: (1) the defendant made a material representation; (2) it was false; (3) when the defendant made the false representation, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) upon making the false representation, the defendant intended that it should be acted upon by the party; (5) **the victim acted in reliance upon it**; and (6) the victim thereby suffered injury. *Id.* (emphasis added). Similarly, a claim for negligent misrepresentation requires proof that: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by **justifiably relying** on the representation. *See Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (emphasis added).

-17-

It is not *always* the case, however, that a plaintiff claiming fraud or negligent misrepresentation under Texas law will have to prove *actual and direct* reliance upon the defendant's false representations. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 578 (Tex. 2001). As the Texas Supreme Court has recently explained, the standard in Texas is quite different:

> [W]here a party makes a false representation to another with the *intent or knowledge that it should be exhibited or repeated to a third party for the purpose of deceiving him*, the third party, if so deceived to his injury, can maintain an action in tort against the party making the false statement for the damages resulting from the fraud.

*Id.* (quoting *American Indem. Co. v. Ernst & Ernst,* 106 S.W.2d 763, 765 (Tex. Civ. App.—Waco 1937, writ ref'd)) (emphasis added). In this regard, Texas jurisprudence is consistent with the Restatement (Second) of Torts:

> One who makes a fraudulent misrepresentation is subject to liability to the persons *or class of persons* whom he intends *or has reason to expect* to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

Restatement (Second) of Torts § 531 (1977) (emphasis added).

While reliance is an essential element of a claim for fraud or misrepresentation under Texas law, a fraud victim's reliance on a fraudfeasor's misrepresentations may be inferred from circumstantial evidence. *Matis v. Golden,* 228 S.W.3d 301, 311 (Tex. App.—Waco 2007, no pet. h.) (quoting *Ernst & Young,* 51 S.W.3d at 577). Similarly, there is no requirement under Texas law that a direct relationship exist between the plaintiff and the defendant. *See id.* at 306 (affirming a judgment against two defendants for fraud where the plaintiffs learned of the misrepresentations indirectly through a chain of communications). A defendant may be liable for fraud or

-18-

misrepresentation even when other factors may have contributed to the victim's loss — that is to say, a defendant's false or misleading statement need not be the *only* inducer of the plaintiff's course of action which led to the injury. *See Marburger v. Seminole Pipeline Co.,* 957 S.W.2d 82, 86 (Tex.App.—Houston[14th Dist.] 1997, no writ) (holding that reliance may be proven by showing that the victim was induced by several factors, *including* the defendant's representation); *see also Ferguson v. Security Life of Denver Ins. Co.,* 966 F. Supp. 597, 604 (N.D. Tex. 1998). "Fraud exists where the false representation was made with the intent of reaching and deceiving a third person and thereby caused that third party injury; privity is not required between the fraudfeasor and the person he is trying to influence to establish a fraud claim." *Matis,* 228 S.W.3d at 306 (quoting *In re Enron Corp. Securities, Derivative & "ERISA" Litigation,* 388 F. Supp. 2d 780, 784 (S.D. Tex. 2005)) (internal quotations omitted).

The lynchpin of Wells Fargo's argument here is premised on its contention that the plaintiff has to prove up each class member's reliance. But Texas fraud jurisprudence — not discussed by Wells Fargo — does not require direct evidence of each fraud victim's actual reliance. *See Matis,* 228 S.W.3d at 306. "Fraud is usually not discernible by direct evidence and is usually so covert or attendant with such attempts at concealment as to be incapable of proof other than by circumstantial evidence." *Id.* (quoting *Cotten v. Weatherford Bancshares, Inc.,* 187 S.W.3d 687, 707 (Tex.App.—Fort Worth 2006, pet. denied)). In *Matis*, for example, two of the three fraud plaintiffs were not present at trial. *See Matis*, 228 S.W.3d at 306. The trial court sustained the defendants' objection and excluded the present plaintiff's testimony regarding the two absent plaintiffs' reliance. *Id.* n.1. That exclusion notwithstanding, the court of appeals found the evidence in the record

-19-

sufficient to affirm the judgment in favor of *all three* plaintiffs. *See id.* at 306-07.[19]

In accordance with Texas law, the class members' reliance in this case may be established by circumstantial evidence and without individual proof of each member's reliance. If the plaintiff can carry her burden of proof using circumstantial evidence, individual proof of reliance may not be necessary at trial.[20] In this case, the plaintiff has presented evidence of a standard form of order used by Wells Fargo in all cases where Brice represented Wells Fargo in moving for relief from stay. These orders constitute circumstantial evidence that the class (as a whole) relied on Wells Fargo's allegedly misrepresented fees. Whether this circumstantial evidence will be sufficient to meet the plaintiff's burden at trial is not now in issue. For the purposes of class certification under Rule 23(b)(3), the court need only conclude that the issue is *"determinable* on a class-wide basis" so that it will not predominate over other issues common to all class members. *See Bratcher v. Nat'l Std. Life Ins. Co. (In re Monumental Life Ins. Co.),* 365 F.3d 408, 421 (5th Cir. 2004) (emphasis

---

[19] The present plaintiff testified about the defendants' representations, in general, without discussing who may have relied upon them. *Id.*

[20] Ms. Mounce has indicated that she can present circumstantial evidence of reliance sufficient to meet the Texas causation standard espoused above. The standard forms of order memorializing stipulations between Wells Fargo and the putative class members provide *some* circumstantial evidence that the entire class relied upon Wells Fargo's alleged misrepresentations. Once a bankruptcy court endorsed Wells Fargo's form of order modifying the stay in a particular case, that endorsement converted what Wells Fargo *alleged* to be a reasonable fee into an order of the court *directing* a debtor to pay those fees. In *complying* with an order of the court, a debtor does not rely on the creditor's representations. The debtor, instead, relies upon the court's endorsement and complies with the court's directive to avoid civil or criminal sanctions. *See U.S. v. Sorrells,* 877 F.2d 346, 350 (5th Cir. 1989) (affirming the district court's contempt order after the defendant failed to comply with an *agreed* order compelling discovery and could not produce credible evidence establishing that compliance was impossible); *see also Litton v. Wachovia Bank (In re Litton),* 330 F.3d 636, 647 n.1 (4th Cir. 2003) (Shedd, J. dissenting) ("The bankruptcy court did not dismiss Mrs. Litton's Chapter 13 petition for failure to comply with a contractual obligation; rather, the dismissal was premised on Mrs. Litton's violation of the bankruptcy court's *order* memorializing a settlement. The bankruptcy court was authorized to interpret its own order, subject to the rule that its interpretation must be consistent with the Bankruptcy Code. . . . Thus, it is necessary to determine whether Mrs. Litton's proposed plan amounted to a modification or a cure in order to determine whether the bankruptcy court's interpretation of its own order comports with the substantive provisions of the Bankruptcy Code, not to divine the meaning of an ambiguous contract term.") (citing 11 U.S.C. § 105(a)); *see generally Gen. Elec. Credit Corp. v. Timely Secretarial Serv., Inc. (In re Timely Secretarial Serv., Inc.),* 987 F.2d 1167 (5th Cir. 1993) (reversing the decision of a bankruptcy court to set aside an agreed order without giving the parties sufficient notice of the court's intention to do so under Federal Rule 60(b)).

added), *cert. denied*, 543 U.S. 870, 125 S.Ct. 277, 160 L.Ed.2d 117 (2004).  That the court can easily do here.

Another issue likely to arise during trial on the merits of the plaintiff's fraud claim will be whether Wells Fargo made a false representation intending that the representation be relied upon by *someone* (*e.g.*, the debtor or the bankruptcy court).  *See  Ernst & Young,* 51 S.W.3d at 578.  The plaintiff contends that Wells Fargo made the same representation in every case where it moved for relief from stay as part of its standard practice.  The evidence in the record supports the finding that Wells Fargo, in fact, *has* engaged in a standard practice of representing the same amount of fees incurred in each case, regardless of the variation of circumstances surrounding that case.  Wells Fargo's representations and state of mind are thus common issues affecting the class as a whole.

Yet another issue likely to arise is whether Wells Fargo "had information that would lead a reasonable man to conclude that there is a special likelihood that it will reach those persons and will influence their conduct."  *Id.* at 581 (quoting Restatement (Second) of Torts § 531, cmt. d).  Once again, what is in Wells Fargo's possession or realm of knowledge is an issue affecting the class as a whole.  In this case, the evidence indicates that Wells Fargo obtained court orders (in substantially the same form) modifying the automatic stay with the same conditions for maintaining the stay, which included the requirement that the debtor pay Wells Fargo's attorneys' fees as set out in the order.  Whether the existence of a court order requiring a debtor to pay Wells Fargo's attorneys' fees would lead a reasonable man to conclude that the debtor would be influenced to pay that fee, once again, is an issue best left for trial.  For the purposes of this Motion, the court concludes that the issue is also determinable on a class-wide basis and will not require individual determinations for each class member.

*ii.  Sandwich Chef and the Target Wing Theory*

Texas fraud jurisprudence is thus flexible enough to allow a fraud plaintiff to establish reliance and proximate cause without resorting to direct evidence of each class member's actual reliance.  Ignoring Texas law all together, however, Wells Fargo urges a stricter standard of causation in the context of class claims for fraud.  This argument is based on a flawed reading of recent Fifth Circuit precedent.  Wells Fargo invokes an out-of-context statement made in ruling on the certification of a class action premised on claims of civil fraud under the Racketeering Influenced and Corrupt Organization (RICO) Act.  *Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*, 319 F.3d 205, 211 (5th Cir. 2003). The Fifth Circuit opened its opinion with this statement: "Fraud actions that require proof of individual reliance cannot be certified as Fed. R. Civ. P. 23(b)(3) class actions because individual, rather than common, issues will predominate." *Id.*  However, the court, later in the opinion, substantially curbed the apparent breadth of that assertion, stating:

> [W]e disavow any intent to adopt a bright-line rule for establishing proximate cause in all or even most contexts.  Nor do we foreclose the possibility that fraud upon a third party can constitute proof of reliance by a plaintiff under circumstances not present in today's case.

*See id.* at 223 n.13.  The seemingly bright-line introductory statement of the *Sandwich Chef* opinion thus softens considerably in light of the facts of that case, the different substantive law applied in that case, and the Fifth Circuit's rationale for its holding.  Closer review shows why *Sandwich Chef's* teachings shine little, if any, light on the present dispute, which is premised not on RICO fraud, but on fraud under Texas common law.  The Fifth Circuit has not had the opportunity to discuss class certification in the context of Texas common law fraud.  Perhaps it is for this reason that Wells Fargo ignores Texas law all together and instead relies primarily upon *Sandwich Chef* for its overly broad statement of law.  In fact, *Sandwich Chef* is *not* applicable to the present case and

its rationale is properly limited to class actions premised on RICO fraud claims.

The proposed class claimants in *Sandwich Chef* asserted claims of civil fraud under RICO. While Texas common law fraud has characteristics that are somewhat comparable to RICO fraud, the glaring differences between the two bodies of law cannot be ignored here. The Supreme Court discussed one such critical distinction in *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992); *see also Sandwich Chef,* 319 F.3d at 222; *Appletree Square I, L.P. v. W.R. Grace & Co.,* 29 F.3d 1283, 1286 (8th Cir. 1994). According to the Supreme Court, RICO fraud claims are cognizable only when the alleged racketeering activities bring about the alleged harm as a *direct and contemporaneous* consequence. *See Holmes,* 503 U.S. at 268, 112 S.Ct. at 1318. In other words, the racketeering activity must be more than merely the cause in fact of the injury. That is a considerably higher bar than that set for Texas fraud actions. For that reason alone, *Sandwich Chef* and its rationale do not apply here.

But even the stricter RICO causation standard is itself not uniform. RICO fraud jurisprudence contains an exception, commonly known as the target wing theory. *See Summit Properties Inc. v. Hoechst Celanese Corp.,* 214 F.3d 556, 561 (5th Cir. 2000). Under the "target wing theory," an *indirect* fraud or racketeering victim may establish the causal connection between the misconduct and injury without offering proof of reliance. *See id.* at 561. Said the *Summit* court in recognizing the target wing theory:

> In general, fraud addresses liability between persons with direct relationships—assured by the requirement that a plaintiff has either been the *target of a fraud* or *has relied upon the fraudulent conduct of the defendants*. The Fourth Circuit, recognizing the *target wing of these twin limits of liability*, held open the possibility that a plaintiff company may not need to show reliance when a competitor lured the plaintiff's customers away by fraud directed at the plaintiff's customers.

-23-

*Id.* (citing *Mid Atlantic Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 263-64 (4th Cir. 1994)) (emphasis added). According to the *Summit* court, the "target wing" theory may apply where the victims establish that they were the targets of a fraudulent scheme visited upon some third party.[21] *See Summit*, 214 F.3d at 561. This "exception" to general RICO fraud liability rings of *constructive* reliance, analogous to stock purchasers' injury caused by misrepresentations made in the open market. *See id.* at 561 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 244-47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)) ("An efficient market is a critical element of a market's role as an intermediary.").

Shortly after *Summit*, the Fifth Circuit applied the target wing exception in finding that a fraudulent scheme visited upon the plaintiff's *customers* was cognizable under RICO, despite the plaintiff's lack of opportunity to rely directly upon the defendants' misrepresentations. *See Procter & Gamble Co. v. Amway Corp.,* 242 F.3d 539, 565 (5th Cir. 2001). In *Procter & Gamble*, the plaintiff (P&G) claimed that the defendants had spread false rumors as part of a scheme to lure P&G's customers away by fraud. *Id.* Even though P&G itself had not relied on the defendants' false rumors, P&G successfully demonstrated that it had been the *target* of the fraud because the defendants specifically targeted P&G's customers with the intention of injuring P&G's competitive position.[22] For those reasons, said the Fifth Circuit, the injury alleged by the plaintiff was a direct and contemporaneous consequence of the fraudulent activity such that the "target wing" exception applied. *Id.*

---

[21] The target wing theory was found not to be applicable on the facts of *Summit*, however, because the plaintiffs failed to raise the argument that they had been the targets of the defendants' fraudulent marketing scheme.

[22] Actually, the court held that the plaintiff's complaint could not be dismissed under Rule 12(b)(6) considering the facts alleged and in light of the target wing theory. *See id.* That reasoning is applicable here where the court need not rule on the merits but only determine whether there is a case to be made under the target wing theory in the event that there is a trial on the merits in the future.

The facts of *Sandwich Chef*, however, did not support the same application of the target wing theory.  In that case, several insurance policy holders sought class certification of their RICO civil fraud claims against several insurance companies and the National Council on Compensation Insurance ("NCCI")—an organization which corresponded regularly with state insurance regulators regarding legal rates.  *Sandwich Chef,* 319 F.3d at 211.  The basis of the plaintiffs' complaint was that their insurance companies defrauded them by charging inflated rates.[23]  As a defense to the class action, the defendants argued that each insurance policy was derived from individual negotiations, making class-wide reliance a highly individualized issue.  *See id.* at 213.  To avoid the issue of proving each *class member's* reliance, the plaintiffs proposed a "fraud-on-the-regulator" theory, alleging instead that the defendants had defrauded the *state regulators* into approving illegally inflated rates, and that the mere act of approving these rates caused the plaintiff policyholders' injuries.  *Id.* at 214.  The Fifth Circuit rejected this theory.  *See id.* at 216-17.  In the context of RICO fraud claims, said the court, the target wing exception applies only in narrow circumstances so as not to unnecessarily broaden the scope of RICO's coverage.  *See id.* at 220.  As the court explained, this

---

[23] The plaintiffs in that case had purchased insurance policies from several defendant insurance companies.  *See id.* at 212-13.  The insurance companies then billed the plaintiffs at rates beyond what the plaintiffs thought to be legal.  Sensing that they had been defrauded, the plaintiffs sued the insurance companies and the NCCI.  To get around the need to prove actual reliance on the defendants' misrepresentations, the plaintiffs turned to the target wing theory and laid out the relationship as follows:  First, the insurance carriers reported their rates to NCCI.  *Id.* at 212.  Then, NCCI reported the filed rates to state regulators.  The state regulators, then, according to the plaintiffs, relied upon NCCI to review the rates filed by the insurance carriers to ensure that the rates were within the legal limits and that policy holders were not being overcharged.  The plaintiffs averred that NCCI knew of the overcharges but, due to some alleged collusion with the insurance carriers, never disclosed the overcharges to the state regulators.  The plaintiffs claimed to have relied directly upon the state regulators' approval of, or acquiescence in, the filed rates as lawful, and they further argued that the regulator's "approval" had been procured by the defendants' fraud.  *Id.*

The defendants urged, as a defense, that the plaintiffs' alleged injury could not have been proximately caused by reliance on the fraud-tainted approval of the regulators.  Said the defendants, the plaintiffs purchased these policies not merely over the counter based on what the state regulators allowed, but rather, only after extensive individualized negotiations.  These negotiations, according to the defendants, included face-to-face meetings, telephone conversations, and correspondence varying in form from transaction to transaction.  *Id.* at 213.  The defendants objected to the plaintiffs' motion for class certification, arguing that their defenses required individual proof based on each transaction which would predominate over the common issues of law and fact.  *Id.*

narrow application stems *not* from the nature of the target wing theory itself (because the target wing theory is not confined to RICO actions),[24] but from the foundational goals inherent in RICO jurisprudence.   Said the court, "*Holmes* . . . teaches that a RICO plaintiff must show a 'direct relation between the injury asserted and injurious conduct alleged[,]' and that a RICO predicate act 'visited upon a third person' is generally too remote to permit a recovery from a person who complains of injury flowing from that act." *Sandwich Chef,* 319 F.3d at 222-23 (quoting *Holmes,* 503 U.S. at 268, 112 S.Ct. at 1311).[25]  *Summit* and *Procter & Gamble* were consistent with *Holmes* in that respect, and the *Sandwich Chef* court's summaries of those cases are instructive here:

> In *Mid Atlantic* and *Procter & Gamble* there were direct and contemporaneous relationships between the acts of fraud directed against the third parties and the harm the plaintiffs incurred.  When Mid Atlantic's customers relied on fraudulent communications about rates, it had to lower its charges to avoid losing them as customers. When Procter & Gamble's competitor spread false rumors, it lost sales due to customer boycott.  *The risks of injuries arose in both* Mid Atlantic *and* Procter & Gamble *as direct and contemporaneous results of the allegedly fraudulent predicate acts.*

*Id.* at 223-24 (emphasis added).

The chain of causation proposed by the plaintiffs in *Sandwich Chef* did not satisfy this "direct and contemporaneous" requirement.  *See id.* at 224.  The state insurance regulators' role was said

---

[24] While the term "target wing" does not appear in Texas fraud jurisprudence as such, the same basic concept — that proximate cause may be established through evidence other than direct proof of reliance — is commonly accepted in the context of Texas common law fraud and negligent misrepresentation.  *See Ernst & Young,* 51 S.W.3d at 578; *American Indem. Co.,* 106 S.W.2d at 765; *Marburger,* 957 S.W.2d at 86 (Tex.App.—Houston[14th Dist.] 1997, no writ); *see also Ferguson v. Security Life of Denver Ins. Co.,* 966 F. Supp. 597, 604 (N.D. Tex. 1998); *In re Enron Corp. Securities, Derivative & "ERISA" Litigation,* 388 F. Supp. 2d 780, 785 (S.D. Tex. 2005); Restatement (Second) of Torts § 531 (1977).

[25] The Fifth Circuit highlighted three reasons behind the *Holmes* court's conclusion: (1) the difficulty in determining damages attributable to the RICO violation as the relationship becomes more attenuated; (2) the complicated rules that may be required to apportion damages correctly without risking multiplicity of recoveries; and (3) the lack of justification for grappling with these problems in light of the more likely event that the directly injured parties would vindicate the rights of the more remote victims through direct law suits against the bad actors. *See id.* at 223.  None of those reasons are implicated by the applicable law and the facts of the present case.

to be too insignificant to bring about the plaintiffs' injury as a *direct and contemporaneous* consequence.  *Id.*  Because the Fifth Circuit dismissed the target wing theory under the facts present in *Sandwich Chef*, the plaintiffs' RICO class claims required proof of individual reliance.  *See id.* The court thus concluded that certification of the class was inappropriate, finding that those individual issues of each class member's reliance would predominate over common issues.  *See id.*

### iii.  *Sandwich Chef Is Inapplicable.*

The narrow application of the target wing theory in the RICO context has no bearing on the present case. We have already discussed the distinction between Texas fraud jurisprudence and RICO fraud jurisprudence.  A plaintiff claiming fraud under Texas common law may prove reliance by class members through circumstantial evidence.  *See, e.g., Matis v. Golden*, 228 S.W.3d 301, 307 (Tex.App.—Waco 2007, no pet. h.) ("Therefore, we cannot agree that [two of the three plaintiffs/appellees] are not entitled to recover by virtue of being unable to appear and testify at trial."); *see also Marburger v. Seminole Pipeline Co.,* 957 S.W.2d 82, 86 (Tex.App.—Houston[14th Dist.] 1997, no writ); *Ferguson v. Security Life of Denver Ins. Co.,* 966 F. Supp. 597, 604 (N.D. Tex. 1998); *In re Enron Corp. Securities, Derivative & "ERISA" Litigation,* 388 F. Supp. 2d 780, 785 (S.D. Tex. 2005).[26]  The foundational principles of fraud under Texas law, thus, do not compel the

---

[26] That is not to say that fraud claims are easily maintainable as class actions under the Texas Rules of Civil Procedure.  Texas Rules with respect to class action are virtually identical to the Federal Rules.  *Compare* Fed. R. Civ. P. 23(b)(3) *with* Tex. R. Civ. P. 42(b)(3).  The Texas Supreme Court has previously held that a class cannot be certified if proof of individual reliance was necessary *to prove actual damages.  Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 694 (Tex. 2002) (quoting *Perrone v. General Motors Acceptance Corp.,* 232 F.3d 433, 440 (5th Cir. 2000)).  That case is not applicable here for several reasons.  First, the *Henry Schein* court was faced with, and decided, issues pertaining to Texas procedural law.  This, however, is a federal court.  This court is bound by Federal Rules and federal precedent interpreting those rules.  We look to Texas case law only to determine the substantive law in Texas, as the claims asserted in this case arise under Texas common law.  The *Henry Schein* court did not address the substantive issue of whether proximate cause between fraudulent acts and harm caused as a result may be proven without resorting to proof of actual reliance.  Second, based on the facts in *Henry Schein*, the court presumed that actual reliance was the only method for establishing actual damages.  In our case, there are several ways to calculate class members' actual damages, none of which will require proof of actual reliance.  Third, just one year before the Texas Supreme Court issued the *Henry Schein* opinion, that same court issued the *Ernst & Young* opinion (discussed in the text above).  In the *Henry Schein* opinion,

same narrow application of the target wing theory as was held to be justified in the RICO context by the Fifth Circuit in *Sandwich Chef*.  And even if they did, the facts of this case would likely fit within that narrow exception.[27]  In all events, the reliance element of the plaintiff's fraud claim will not predominate over common issues affecting the class as a whole.  Further, in light of the other three factors of Rule 23(b)(3), all of which favor class certification, the proposed class action would be superior to other available methods for fairly and efficiently adjudicating this controversy.  *See* Fed. R. Civ. P. 23(b)(3).

---

the court did not address (or even cite) the *Ernst & Young* opinion.  Even if these two opinions contradict each other, this court need not reconcile that conflict, nor does this court need to make an "Erie guess" on the substantive law of Texas.  The Texas Supreme Court, in *Ernst & Young*, answered the question.  To the extent that these two opinions conflict, the opinion addressing substantive law (*Ernst & Young* ) is controlling in this case.

[27] The Fifth Circuit rejected the "fraud-on-the-regulator" theory in *Sandwich Chef* because the state regulators played no substantial role in the relationship between the policy holder and its insurance carrier.  Said the court:

> Although disclosure of the true premiums to a regulator could *prevent* injury to the policyholders by prompting the regulator to interdict the carrier's attempt to bill at an inflated rate, concealment of the inflated premiums would not result in the direct and contemporaneous injury to the policy holder without the additional act of billing.  *The regulator's reliance on the fraudulent act would not alone be enough to result in a direct and contemporaneous injury to a policyholder that satisfies RICO's proximate cause requirement.*

*Sandwich Chef,* 319 F.3d at 224 (emphasis added).  Unlike the state regulator's limited role in *Sandwich Chef*, a bankruptcy court's role in the present case would be an *essential* factor inducing a debtor to pay the fees in accordance with the terms of the order.  As an example, if a bankruptcy court ordered a debtor to pay a creditor's costs, what choice would that debtor have?  The options are: compliance, appeal, or contempt.  The state regulators did not carry this kind of authority in *Sandwich Chef*.

A court retains the right to determine whether its orders were procured through fraud or misrepresentation and should grant relief accordingly.  *See Leber-Krebs, Inc. v. Capitol Records,* 779 F.2d 895, 899-900 (2d Cir. 1985).  Upon issuing an order, a bankruptcy court accepts the representations made on the records (or in the form of order itself) and relies upon the veracity of each party's contentions.  *See, e.g.,* Fed. R. Bankr. P. 9011(b); *see also* Fed. R. Civ. P. 11.  In that regard, a debtor's presumed reliance on a creditor's misrepresentations to a court would not be entirely unlike an investor who is presumed to rely upon misrepresentations made by an unknown third party in the public market.  *See Basic Inc. v. Levinson,* 485 U.S. 224, 246, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988).

*iv.  Other Issues of Predominance*

The court also concludes that the plaintiff will be able to establish damages on a class-wide basis using a simple calculation.  This will not require the court to determine the harm caused to each individual class member based on each individual transaction.  Ms. Mounce does not contend that each class member suffered varying degrees of injury based on the extent of each class member's reliance on Wells Fargo's alleged misrepresentations.  Instead, the variation of damages depends entirely on what Brice actually billed Wells Fargo in each case, a factor having no relation to the reliance element.  While these figures may vary in dollar amount from individual to individual, those amounts may be tabulated by means of discovery and, if liability is ultimately found and damages adjudged, a simple formula can allocate those damages accordingly without considering individual circumstances of each class member.

Wells Fargo also contends that its defenses of waiver, acquiescence, and estoppel require evidence of individual negotiations and courses of dealing, and so this court must consider the merits of its defenses on a case-by-case basis.  True, the court must consider how the merits of the case will be tried before certifying a class under Rule 23(b)(3).  Wells Fargo's argument, however, rings of the statute of limitations defense raised by the defendants and rejected by the Fifth Circuit in *Monumental Life.*

In *Monumental Life*, the defendants relied on a theory of constructive notice to demonstrate that several class members' claims were barred by the statute of limitations.  The defendants in that case argued that some of the individual class members' claims were time barred, but that the court would need to consider individualized evidence to determine when each class member gained actual or constructive notice of his or her potential cause of action.  *See Monumental Life,* 365 F.3d at 421.

The Fifth Circuit was not convinced that this individualized defense predominated, especially in the face of the defendants' alleged fraudulent concealment.  *See id.*  Instead, to determine whether the issue of each member's notice predominated over issues common to all class members, the Fifth Circuit employed a simple, but effective test:  Is the issue determinable on a class-wide basis?  *Id.*[28] The answer in that case was a resounding no.  The plaintiffs demonstrated that "widespread publicity" sufficient to put a putative class member on constructive notice could be determined from national media sources, such as newspapers, rather than requiring individualized evidence.  Because the defendants had not raised sufficient arguments against the use of nation-wide media sources, the Fifth Circuit concluded that constructive notice, while a valid defense applicable to individual class members, was nonetheless an issue that was determinable on a class-wide basis and so was not a bar to class certification.  *See id.*

Likewise, Wells Fargo's defenses of waiver, estoppel, and acquiescence will not cause individual issues to predominate.  First, as discussed *supra*, individual negotiations and courses of dealing will not be relevant if, as the plaintiff contends here, the agreements were memorialized and entered as an order of the court.  The plaintiffs' reliance, then, would not be on the underlying agreement but, instead, on the court order which memorialized that agreement.  The court already concluded that Wells Fargo's standard form of order was employed in all of the class members' bankruptcy cases.  The primary factor inducing the class to pay Wells Fargo's allegedly misrepresented attorneys' fees is thus common to the class as a whole.[29]  In the same vein, the court

---

[28] While the court in *Monumental Life* discussed the standards under Rule 23(b)(2), the court of appeal's message is equally applicable to the case  at bar.

[29] That is not to say that the circumstances surrounding every class member's bankruptcy case will be identical.  Surely, there will be *some* variance from case to case.  Common to every case, however, are the orders modifying stay and directing the class members to pay Wells Fargo a sum of $600 for attorneys' fees incurred in prosecuting its motions for relief from stay.  Recall that Texas law does not require an inducing factor to be the *only* such factor causing a fraud

fails to see how waiver, estoppel, or acquiescence would bar the plaintiffs' recovery if the order

compelling payment had been procured through fraud or a material misrepresentation. The court

thus rejects Wells Fargo's contention that its defenses will raise predominating individual issues at

trial. For this reason, the court concludes that the difficulties likely to arise in managing this case

do not stand in the way of class certification. At trial, should the court find itself faced with more

individualized issues than originally anticipated, those issues may be addressed at that time. *See*

Fed. R. Civ. P. 23(c)(1)(C) (providing the means to alter or amend class certification orders before

final judgment).

### CONCLUSION

For the foregoing reasons, the court will grant the plaintiff's motion in part. The court cannot

certify the class for the plaintiff's asserted cause of action of coercion because that cause of action

has not been recognized by Texas courts or the Fifth Circuit. The court further denies certification

of the class under Rule 23(b)(2) because the predominate relief sought by the plaintiff is monetary

in nature. Having found that the prerequisites for class certification to be satisfied, and that the

proposed class is maintainable under Rule 23(b)(3), the court concludes that the class should be

certified for the breach of contract and fraud claims under Rule 23(b)(3). The court will issue a

separate order consistent with this opinion.

# # #

---

victim's injury. *See Marburger v. Seminole Pipeline Co.,* 957 S.W.2d 82, 86 (Tex.App.—Houston[14th Dist.] 1997, no writ); *see also Ferguson v. Security Life of Denver Ins. Co.,* 966 F. Supp. 597, 604 (N.D. Tex. 1998). The only evidence in the record indicates that these court orders *would be* the primary inducers in each case — Wells Fargo has not indicated what individualized evidence it would introduce at trial that would supercede these court orders, and this court has serious doubts that any such evidence exists, given the highly standardized practice employed by Wells Fargo in moving for relief from stay.